# Miller's Case.

*Receivers—Estate of weak-minded person—Conduct of business —Accounts—Inventory—Costs.*

1. A receiver should have an inventory made of the property committed to his care.

2. A trust company should not accept a receivership over a precarious business of a weak-minded person, and continue such business for a period of more than eighteen years.

3. If it does so and an extended audit is rendered necessary, the costs of the audit, and judicial proceedings incident thereto, will be upon the company, although it may not be otherwise surcharged.

4. A trust company which has been appointed receiver of the business of selling furniture on the installment plan, will not be surcharged with loss caused by depreciation of merchandise, and by failure of installment creditors to pay their accounts, where it appears that the business was conducted under a capable and experienced manager, who was the wife of the weak-minded person who owned the business, that the company had acted throughout under advice of counsel, that in the opinion of witnesses engaged in similar enterprises, the receiver had used good judgment, and that the wife who took the whole of her husband's estate after his death, had acquiesced in the acts of the receiver.

5. A receiver is not personally liable merely because the business may have been conducted at a loss, especially where he acted in good faith, and the loss did not result from misconduct or negligence.

Argued March 20, 1923. Appeal, No. 271, Jan. T., 1922, by Francis M. McAdams, Guardian, from order of C. P. No. 5, Phila. Co., Dec. T., 1902, No. 4168, confirming auditor's account in the matter of Richard Miller, a weak-minded person. Before WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Affirmed with costs on appellee.

Exceptions to report of Frank Smith, Esq., auditor. Before MARTIN, P. J.

The opinion of the Supreme Court states the facts.

Exceptions dismissed.  Francis M. McAdams, guardian of Richard Miller, a weak-minded person, appealed.

*Error assigned,* inter alia, was order, quoting record.

*Michael D. Hayes,* with him *William H. Wilson* and *Eugene Raymond,* for appellant.—The receiver was clearly liable to surcharge: Schwartz v. Oil Co., 153 Pa. 283; Gillespie v. Glass Co., 189 Pa. 50; Covington v. Hawes, 245 Pa. 73; Tenth Nat. Bank v. Construction Co., 242 Pa. 269.

*M. B. Saul,* of *Saul, Ewing, Remick & Saul,* with him *Joseph A. Lamorelle,* for the West End Trust Co., appellee.—No negligence or misconduct can be imputed to a receiver where he acts under advice of counsel: Penna. Engineering Works v. Stamping Co., 259 Pa. 378.

A receiver is not liable to surcharge unless it is clearly shown that losses have resulted by its negligence or misconduct: Penna. Engineering Works v. Stamping Co., 259 Pa. 378.

OPINION BY MR. JUSTICE SCHAFFER, April 30, 1923:

By this appeal, it is sought to bring about the surcharge of the West End Trust Company, receiver appointed by the common pleas for Richard Miller.

Richard Miller was engaged in the business of selling household goods and furniture on the installment plan. He at one time carried on fifteen or more stores in a number of cities.  As a result of mental derangement, he was placed in an insane asylum, where he remained for a comparatively short period, during which time his wife, Emma D. Miller, carried on the business.  On leaving the asylum, apparently cured, he resumed business, assisted in it by his wife, and together they carried it on for more than four years, when, his mental troubles having reasserted themselves, he was committed to the Norristown Insane Asylum, where he was still an

inmate at the time of the disposition of this proceeding in the court below. He has since died.

In February, 1903, on petition of Mrs. Miller, the West End Trust Company was appointed temporary receiver of her husband's property and estate. The business was continued by the receiver, under an order of the court authorizing it so to do, from the time of its appointment, for a period of more than eighteen years. When the trust company took charge, the business had decreased so that it was being carried on in but three cities, Harrisburg, Reading and Trenton. An office was maintained in Philadelphia, to which reports were transmitted, but no sales were made there.

The receiver did not pursue the usual, ordinary and much to be commended practice, of having an inventory made of the property committed to its care, the apparent reason being that it was supposed Miller would be restored to sanity within a short time. It did not file an account for eight years, then expert accountants were employed to go over the business it had carried on and prepare a statement. The merchandising was entirely with poor people, who purchased under installment leases, making small weekly payments. The testimony disclosed that such a business is a most precarious one. In the time covered by the first account, the appellee appears to have received more than $300,000 in cash from sales, to have bought goods amounting to over $245,000, and to have paid in salaries, commissions to salesmen and expenses about $175,000.

Soon after the appointment, it became apparent to the receiver the business could not be carried on without employing a manager conversant with the methods of operating such an enterprise. It suggested the appointment of a manager to Mrs. Miller, who objected on account of the expense, and undertook to manage the business, first at a salary of $15 per week and later at a salary of $25 per week. She was shown by the testimony to be a thoroughly competent person to conduct it, and

the money she received enabled her to support herself, and aid in the care of her husband, part of whose maintenance also came out of the receipts. The manner of carrying on the stores, by the receiver, including the system of accounting, was similar to that pursued by Miller and his wife, in their conduct of it.

As before mentioned, no inventory was made by appellee, but the first account, which would seem to have been very carefully and accurately prepared by expert accountants, may be considered, so far as this proceeding is concerned, as taking the place of an inventory, as it apparently stated all of the assets then in Miller's business, and appraised their value.

The basis of the demand for surcharge of the receiver is, that there had been a great shrinkage in the assets, as shown by the first account, when the second account was filed in 1917. In the first account, there was a balance of cash, property and accounts receivable amounting to $109,202.82. In exhibiting it to the court, the receiver stated there were no liabilities, outstanding obligations or creditors of the estate. This account was confirmed without audit. The second account was also prepared by expert accountants, after what was apparently a most exhaustive inquiry into the operations of the receiver, in which they investigated not only what had been done during the six years following the filing of the first account, but, in certain respects, transactions prior to the first account. The second account showed a balance in the lunatic's estate of but $23,279.66; more than $85,000 less than the balance shown by the first account.

An auditor was appointed to pass upon the second account, and, in doing so, he not only considered the items in it, but the management of the business generally by the receiver from the time of its appointment. When the audit was started, no guardian had been appointed for the lunatic. Subsequently, Francis M. McAdams, Esq., was so appointed. With commendable zeal, in the dis-

charge of the trust committed to him, he started an exhaustive inquiry into the eighteen years' business of the receiver, contending that the balance of more than $109,-000, shown by the first account was not satisfactorily discharged in the second account, that the deductions and losses claimed were not justified, but appeared to be the result of negligent management by the receiver, for which it should be surcharged.

The principal items representing the loss, as shown by the second account, were depreciation in the value of unsold merchandise, $17,269.75; credits claimed for accounts contracted with customers prior to the date of the first account, treated as uncollectible and worthless in the second account, $39,387.23; credits claimed for accounts contracted with customers subsequent to the date of the first account, set forth as uncollectible and worthless in the second account, $21,404.47; and a credit claimed for losses in the collection of assets amounting to $5,113.93, a total of $83,175.38.

It may be fairly considered that the first account, prepared by the expert accountants, was in reality an audit, in the sense that all transactions of the receiver were examined and verified. We do not understand appellant to claim any mismanagement of the business prior to the first account, but on the contrary that he accepts it as being correct and uses it as the foundation for the claim of surcharge. It is also true that the second account was a complete audit of the transactions of the receiver, everything being examined and verified by disinterested public accountants. Any further audit would require going over the same vouchers, books, contracts, receipts and expenditures as they had examined.

As we understand, the complaint of appellant is, not as to the thoroughness of the work done by the accountants or the review of the auditor, but as to the conclusions arrived at by the one and adopted by the other. The record is a voluminous one, but the main contentions boil down to three: first, there was no satisfactory ex-

planation of the claim for credit of $17,269.75 for shrinkage in the value of unsold merchandise; second, there was no adequate evidence that the installment accounts, both those claimed as assets in the first account, amounting to $39,387.23, and those coming into being between the first and second accounts, amounting to $21,404.27, were worthless, or could not have been collected if due diligence had been used; and, third, there was no reliable proof covering the credit claimed for losses in collection of assets amounting to $5,113.93.

The position of appellant as to the first is, that, as the original account showed merchandise on hand amounting to $26,864.69, and the second account shows that on hand to be valued at $9,594.94, the receiver should be surcharged with the difference, for which it claimed credit, $17,269.75, because there is no proper proof of what caused the shrinkage in the merchandise on hand. When we consider of the kind of business that was being carried on, and the way it had to be conducted, we think nothing by way of surcharge can be predicated upon these figures. The business was an active one. It could not be expected that the merchandise on hand at the time of the filing of the first account, would be the same merchandise that would be on hand when the second account came to be filed six years later, or even if it were, that it would have the same value. In running the business, it was necessary for the receiver to keep supplying the different stores with stock as it was depleted by sales; it also appeared that often, when sales were made under the installment leases, merchandise had to be taken back, where there was a default in payment. It would require a very accurate system of bookkeeping, to at all times reflect the exact situation as to merchandise on hand under these circumstances. The expert accountants, who fully went into this matter, were satisfied that all merchandise had been as accurately accounted for as was possible under the conditions inherent in the busi-

ness; this was the conclusion of the auditor; we see no reason to disagree with his finding as to this.

So far as the credits claimed on worthless installment accounts are concerned, whether those embraced in the first accounting, or the second accounting, while the losses are very large, yet considering the precarious nature of the business, the method necessary to be pursued in carrying it on, the class of people with whom dealings were had and the insecurity of the credit extended, the testimony of witnesses summoned to show the losses inevitable in such an enterprise, and the painstaking examination made by the expert accountants of these accounts, we are not prepared to say that the credits claimed for losses on them were not rightly allowed. In the exercise of good business sense, the receiver ought not to have charged itself with the face value of these credits in its first account, for even at that time it had knowledge that many of them were uncollectible. When the expert accountants came to make up the second account, they not only examined into all these accounts, but submitted them to the managers of the several stores, familiar with the persons to whom credit had been extended, who reported on them and confirmed the investigation made by the accountants. We think the examination of the expert accountants, as to these debts due on installment leases, was as thorough as could be made, and justified the finding of the auditor that they were uncollectible and worthless, and that the failure to collect them was not ascribable to the receiver, but to the precarious character of the business and of the credit extended.

Taking up the third item, the credit claim of $5,113.93, it was the opinion of the expert accountants, from their examination, that the loss which this represented, was due to thieving, embezzlement by collectors necessarily employed by the store managers to collect the installment payments, and to the failure always to properly credit back, on the sales account, merchandise returned.

The testimony disclosed that there had been thieving and embezzlements by collectors. The conclusion of the accountants was that the bookkeeper had at times forgotten to mark return items as returned. These circumstances, in the judgment of the accountants, would establish this claim of credit in the receiver's account. We think the auditor was justified in allowing it.

As to the general conduct of the business, it was the opinion of witnesses, engaged in similar enterprises, that the receiver had used good judgment. From a careful examination of the entire record, we are satisfied there was no negligence or misconduct on its part. It acted throughout under the advice of counsel. It endeavored to make sale of the business, but could not do so, and was faced with the alternative, of closing the stores, which would have resulted in an almost total loss. Mrs. Miller strongly urged that this should not be done. The receiver was confronted with the necessity to provide maintenance for the lunatic and his wife; trusting the management of affairs to her, it possibly did not exercise that sharp oversight and close supervision which such a business calls for, but did direct it in a reasonably careful and prudent way under the circumstances. The auditor found, "By a continuation of the business, even though there is shown a deflation in the paper assets, it must be remembered that, for all these years, by the sale of these goods, which at a public sale would have brought practically nothing, the lunatic and his wife have both been comfortably supported and maintained." As the result of the death of her husband, Mrs. Miller is the real party in interest and is in no position to complain. The auditor found, she had, at least tacitly, acquiesced in everything that had been done, and that she had been in active charge. We have said that a receiver is not personally liable, merely because business may have been conducted at a loss, especially where he acted in good faith, and the loss did not result from his misconduct or negligence: Penna. Engineering Works v. New Castle

Stamping Co., 259 Pa. 378; McDowell's App., 4 Penny-packer 384. While complaint is made that the receiver did not vouch its account, our conclusion is it substantially did so, through the medium of the complete examination of all its transactions by the expert accountants.

In what has been said, we have disposed of appellant's main contentions; without particularizing, we may add that we have considered the various other items of surcharge urged, but are not convinced that the auditor's disposition of them was incorrect.

We think it proper to observe that in our opinion this trust company should not have been appointed receiver for such a business. Trust companies are not equipped to conduct and manage such enterprises; for management, they must trust to persons outside of themselves. Having been appointed, it should have declined to accept, when it ascertained the character of the undertaking.

It was a mistake for the receiver not to inventory and appraise the property which came into its hands, and to wait eight years before it filed its first account and six more to file a second. This cast upon the guardian of the lunatic, bound under his appointment to scrupulously examine the conduct of the receiver, a great burden which an inventory and periodic accounting would have lessened. We desire also to express our disapproval of a receivership lasting as this one has, for more than eighteen years. Long before the filing of its first account, the receiver should have presented an application to the court for the appointment of a guardian for the lunatic and for permission to turn the lunatic's affairs over to him. In view of the fact that the extended audit and the investigation which the guardian was required to make, was due to the long delay by the trust company in winding up the receivership, the costs of the audit and of this appeal should be borne by the appellee.

The decree, dismissing exceptions to the receiver's account and confirming the report of the auditor, is af-

firmed, with directions to the court below to impose all costs in the proceeding, including the costs of this appeal, on the West End Trust Company.